The Honorable Judges of the United States Court of Appeals for the Fourth Circuit. Oyez, oyez, oyez. All persons having any manner or form of business before the Honorable United States Court of Appeals for the Fourth Circuit are admonished to draw knives and give their attention for the court is now sitting. God save the United States and this honorable court. Thank you, be seated. Welcome to the Fourth Circuit this morning. We'll hear argument in two cases, the first being 25-1492, in re. The Boeing Company. Mr. Wall, we're happy to hear from you. Judge Richardson, and may it please the court. Plaintiff's expert recited the general standard for damages in securities cases, how much an investor is out of pocket, and listed some possible methods for quantifying those damages. If that's all Comcast requires, then Comcast is effectively meaningless, and with it Rule 23's predominance requirement, because an expert could say those same things in every securities case ever filed. There are two obvious problems with what little plaintiffs have done. First, Comcast requires plaintiffs to have a methodology for calculating damages on a class-wide basis before a district court may certify a class. Here, Mr. Kauffman offered only a legal standard, not a methodology. And second, Mr. Kauffman eventually adopted a methodology after certification, but Comcast requires that methodology align with plaintiff's liability theory. Mr. Kauffman's belated methodology, that the inflation in the stock price was constant for the entire three-year class period, is the exact opposite of plaintiff's liability theory, that Boeing's repetition of general statements made them material to the market over time. For either reason, the court should reverse. Sorry, I meant to get in before you finished that. The second point you made, that the model that was eventually adopted, let me just cabin whether you had to do it before or not, but just talking about it on its merits, you say is inconsistent with the materiality by repetition. I understand the plaintiffs mentioned that, talked about it some, but it doesn't seem to me they abandoned any other theories and went whole cloth with that. Does your position depend on them, on the plaintiffs having adopted the materiality by repetition theory altogether? So not on our frontline argument that they didn't do anything before certification, as this court's decision in Marriott requires. On our second argument, though, Roman numeral two in the brief, Judge Quattlebaum, that is an important piece of it, and let me say two things. I don't think it was just a sideshow below. The thrust of our motion to dismiss was, these statements are not actionable because they're huffery, and they came back in their opposition, this is page 467 of the joint appendix, and in the road mapping paragraph to the argument in that brief, we're not talking buried in the argument, in the road mapping paragraph, they said, look, maybe these statements standing alone aren't actionable, but their repetition over time makes them material, and they emphasized it, right? They put it in italics right there in their brief. But under Comcast, why does that matter? I mean, they made that argument, I accept that, but the district court gave us no insight into what theory it believes survived, right? And so that was at least the primary argument they made, but don't we need, per Comcast, the district court to identify what the liability theory is in order to make the comparison to a model? So I don't think so, Judge Richardson. This was the second thing I was going to say to Judge Quattlebaum, which is, at the motion to dismiss stage, yes, under the PSLRA, the district court should go through the statements and call out and explain why they were good or no good. District court didn't do that. That's an error. I'm not relitigating that. At the Comcast stage, for predominance purposes, what the court says in Comcast is, you've got to look at whether the methodology for damages on a class-wide basis matches up with the liability theory. You don't need the district court to sign off on that. You just need to look at what the plaintiff's liability theory was. So if I'm— No, but if there's no comparator, you can't do consistency, right? What's being required here is that you take a liability theory, and you compare it to a damages methodology, assuming one is offered.  But in order to do a comparison, you have to have a comparator. Since the district court never identified, and the plaintiffs sort of seemed to have thrown maybe more than one theory against the wall, it seems like to me, to do that comparison under Comcast, you have to identify the theory first. So the latter part isn't right. They didn't throw multiple theories against the wall, and think about the problem this creates. At the motion-to-dismiss stage, they survived by saying, nope, not just puffery, this is repetition, right? But I'm having to infer that because the district court told us nothing, right? So like, I mean, maybe that's right, and maybe you have the best read of the briefing, but without some guidance from the district court, it seems really hard for me to know that that's true. And your colleague on the other side points to the language where he says it's inflation. I actually don't understand what that means in this context, but I'm in a difficult position of trying to anticipate or divine what the district court thought the theory was, that it then could compare against what was arguably a methodology. So it's fair, but if I could just make a couple points, Judge Richardson. So they get past with the repetition point, and they survive the motion-to-dismiss, right? Then we get to the class certification stage, and they run into the Comcast problem. Then to solve the Comcast problem, they revise their liability theory, and they say, no, no, this is about inflation maintenance, right? If you look at the complaint, page 37, the start, you look at the opt to the motion-to-dismiss start on page 460, that is not the theory of the case. The theory of the case, you judge for yourselves, is you had these crashes, and the market thinks you're unsafe. Then you start making these safety statements, and you lull the market into a false sense of security. That's a classic inflation case, and then the accident happens, and that inflation dissipates. And the problem you create, if you don't hold them to the liability theory they put forward in the motion-to-dismiss, if I'm right about the best reading, is it becomes a bait and switch. One theory gets them to class certification, and then the other theory gets them back. And they shouldn't get a do-over on this, Judge Richardson. There was no do-over on Comcast, no do-over in Ward or BP. They're going to get a do-over either way, right? So if we reverse it and send it back, the court can reconsider class certification at any time, right? So they can just redo this whole process. I mean, it's up to the district court's discretion, but it's not as if you're asking us to reverse an order that there never be a class certified, right? Well, you reverse the class certification. You send it back. Individual plaintiffs here get to move forward with their claims, and any other individual plaintiffs who can satisfy the statute are opposed. It's not so easy as just, well, we can redo class certification. Judge Anderson in South Carolina has a great opinion in a case called Blackbaud, explaining, no, in order to revise class certification, get a redo, you have to show a material change in the evidence. You have to show something that's really happened while you get another bite of the apple. But doesn't that argument really hinge on us agreeing that the plaintiff at the motion to dismiss stage, A, abandoned their . . . each representation was material theory and adopted the repetition, and B, that the district court ruled that way? It seems to me hard . . . it's hard . . . even in terms of what the plaintiff did, there are . . . I read only a relatively small part of their briefs and wasn't a whole lot at the hearing on the liability theory, and I just didn't get the sense that they had whole cloth gone with the materiality by repetition. Now, I don't think that saves them, because you've got to do the comparison, and liability theory or theories need to be identified so you can do it. But it seems to me you're asking us to agree with that. Maybe that's right, but that's a hard read for me, based on the record. Well, I don't . . . Judge Caldwell, I want to be really clear. The most straightforward way to resolve the case is this court said in Marriott, you have to do the methodology before certification. That's obvious from Comcast. All they said was out-of-pocket damages. Out-of-pocket damages is not enough. No matter what some district courts have said, it's not enough. Then they came in, pointed to the merits report, and said, no, no, we've got constant percentage inflation. We put out a methodology. Is that effectively like a harmless error argument? So they're saying, in that sense, they acknowledge we didn't do what we were supposed to, but it's harmless, because within a week of the class decision, we've provided what would have sufficed had we provided it before. I mean, I don't know if that's the way they think about it, but what I would say is, if that's their argument, which they haven't made in the briefs, I don't think it's harmless, because if they had come in and put forward the constant percentage inflation, then we would have been saying the same thing we're saying to this court now, which is, wait a minute, Judge Brekkema. They have two mismatches on our Comcast. They're saying that the statements matter to the market over time, but they have not baked in the inflation. They've assumed it all from day one. That's the front end. And on the back end, they haven't separated out the drop that occurs from the materialization of the risk, the market discovering Boeing's manufacturing process was less safe than it was, from the inevitable stock drop you would have had, even if the market understood exactly what was going on at Boeing, and you get the Alaska Airlines incident. You still would have had a stock drop, and they haven't isolated those two things. That seems to be asking for the damage calculation itself, as opposed to the methodology that takes into account a drop unrelated to an inflated price. I want to be really clear about this, Judge Quattlebaum. No, that's not what we're asking for. I'm not saying that Mr. Kaufman needed to tell you how much was materialization of the risk and how much was the inevitable stock drop from the accident. He doesn't have to put numbers on it. He doesn't have to pull out the calculator in the green eyeshade and do the math. What he can't do on our Comcast is just give you an IOU. He's got to explain to a reasonably intelligent district judge how that district judge down the road is going to help them do the calculation, because if you don't know there's a way to do it for the class, then common questions, the Supreme Court says in Comcast, will inevitably be overwhelmed by the individualized damages. So he's at least got to say— Won't taking out the confounding factors always be the same for every member of the class? I mean, this is not a confounding factor that depends on individual determinations, is it? So, Judge Wessling, you could use an event study to separate out the confounding factors, like what else happened in the market that day that might have driven down the stock price from the stock drop itself. What you can't do with an event study is separate what I'm talking about, the materialization of the risk from the inevitable stock drop. Yeah, but is that going to differ on individual class members? No, but that's the argument the Supreme Court rejected in Comcast. It said, wait a minute, that's commonality, right? You can have a really, really bad mismatched damages model. It'll be bad and mismatched for the entire class, but that's not predominance. The question for predominance purposes is, do you have some reliable way to do it for the whole class? If you do, then the district judge in a class action will know, okay, I can do class-wide damages. Maybe there'll be a few individualized questions, but generally I can do it as a class. Whereas if you don't have that methodology and the court says we need rigorous analysis, we need evidentiary proof, this is a real meaningful requirement, then a district judge can't know down the road whether the common questions are actually going to predominate. So they're right that if their model is no good, it'll be no good for the entire class, but that doesn't solve the predominance problem, right? I take that to be the Supreme Court's whole point, right? The model in Comcast was no good because it counted four antitrust pricing boxes to one. It was no good for the entire class, but that doesn't get you around the predominance problem. So there are cases, a decent number of cases around various circuits, various district courts, that in a securities fraud 10b-5 context have individual damages in some way. What's Comcast really requiring? Are all those wrong or is Comcast allowed for that some level of individual? Help us understand your view of how some individual components in damages relate to the Comcast standard. Sure. So there are courts that say, and we're not taking issue with this, that as long as you have a class-wide methodology for the whole class, you may have some subgroup of purchasers for whom there are some individualized issues. That's fine. That doesn't necessarily defeat predominance. You'd have to look at any given case, how many were there, how many subclasses, and all the rest, but it doesn't necessarily defeat predominance. But what no court has said is, well, even if you don't have a class-wide methodology, you can still have predominance. Because I take the holding of Comcast to be no. If you don't have a class-wide damages methodology that you know up front with evidentiary proof, you've got some reliable showing that it's going to work, then you can't possibly know whether the common questions are going to predominate over the individualized ones. There are no more liability-only classes? Under B-3? I know maybe elsewhere, but under B-3, is your theory that Comcast has told us a liability-only class is not certifiable under B-3? I don't know if I would go that far. Tell me how I draw the line between those two. I think what I would say is, at least in any case of complexity like Comcast or this one here, where you have a three-year class period, you have 300 statements, you have literally tens or hundreds of millions of purchasers. So you're reading the line that says necessarily overwhelms? To refer to it necessarily overwhelms in a complicated case like this? I think in any case where doing individualized damages would be a really significant undertaking for the district court. So it's not a black and white? It's not that every B-3 class must include class-wide damages, but instead it's sort of a reference to the nature of the complexity? I'm holding that open. I think you could read the Supreme Court's decision. There's no doubt you could read it. I'm asking you how we should read it. I'm saying I don't think the court needs to address that here, which is at least in a case like Comcast or this one the Supreme Court has made clear, it overwhelms the individualized questions because of the complexity of the damages. I think you can hold open for another day. What if you had really simple damages? That's a pretty tough to define standard for district courts to figure out. I mean, you're just saying is it complex enough, then you can do it. I mean, anyway, that's . . . I mean, Judge Quattlebaum, I don't want to fight it too hard. I was trying to be charitable to the plaintiff's bar. I think you can read Comcast to say, like, if you don't have a damages methodology, that's it. You flunk predominance under 23B-3. I'm holding open that the Supreme Court's never addressed that in a much simpler case, but that sort of small exception shouldn't detract from the general rule, which I'm happy to sign on to. Can I do one more thing before we're over? I get your point about we shouldn't permit a do-over, but if you kind of look at where things seem to be now, the briefing from the plaintiff seems to be this inflation maintenance theory, and the expert report that came later talks about this 8% constant inflation. Just assume that was where we were at the certification stage. Would you have an issue with that from a certification standpoint? You mean if they had come in and said in the opening report, here's our constant percentage inflation? Our theory is not just that investors were harmed by misstatements, but that our theory is that what they did in maintaining an artificially high price, that's the liability theory, and the damages methodology is we're going to calculate this with this 8% constant percentage. If that was where we were at certification, what would your position be there? I'd be right back here, Judge Quattrovan. That's why I don't think a do-over gets us anything. I'll be straight back to this court with the same arguments, because what we would have said to Judge Brinkman, and what we did say to Judge Brinkman at the class certification stage was, look, he's tossed out these various methods. If he's meaning to embrace those, here's the problem. You have two Comcast mismatches on the front end and the back end, so you still don't have a methodology that aligns with your liability theory, and the district court waved that through. Why does that? If their theory is that the misreps maintained an artificially high share price, why does an 8% constant inflation not align with that? Now, I have some questions about how you could have some set percentage that applies regardless of what the representation, but in terms of just alignment with that theory, where's the mismatch? In an actual inflation maintenance case, imagine just a really simple one. You know something inside the company that the market doesn't know, and then you make false statements to keep the market uninformed. In that kind of a simple case, I think you could have a tight fit between a constant dollar, a constant percentage, and that kind of a case. The problem with this particular case is if you read the complaint, you read the introduction starting at page 37 of the joint appendix, or you read the opposition to the motion to dismiss, there is not one word about inflation maintenance. This is not a case where they came in and said the market didn't know something, and then you kept them uninformed. Their whole point was the market thought you were unsafe because of the crashes, and then you lulled them into a false sense of security. It's a classic inflation case, not preexisting. Your statements generate the inflation. That's a classic securities case. And so we would have said, wait a minute, you can't pivot liability theories now. You survived the motion to dismiss by saying we made these statements over time and baked in the inflation, not it preexisted and you maintained it. But would you say we necessarily, imagine the complaint was pled in a way that alleged this maintenance theory, and the theory was the constant percentage. Does that necessarily, I mean, we got the BP case that talks about, even in that sort of situation, that certain parts of the case may have individual aspects of it. So I'm trying to, it sounds like you're essentially saying if you came in right from the get-go with maintenance and then came in right from the get-go with a constant inflation, you'd be okay. I'm a little surprised to hear you say that. No, I'm saying I think it helps them on the front end. Now, they're still going to have a problem with the varying inflation from the quality reports over the class period. The expert gave no way to deal with those. And they've still got the back-end problem of separating out the material. Don't they also still have the cumulative problem? Because I understand their inflation maintenance not to be based on a statement, but sort of a continuing set of statements. Oh, yes, sorry. I was taking Judge Quattlebaum's hypothetical to be if they had pleaded the case entirely differently and briefed it entirely differently at the motion to dismiss stage. If they had put in the same opposition to the motion to dismiss, they'd have exactly the same problem. And why I'm frustrated with this, Judge Quattlebaum, and maybe the court is too, is that it's a shell game, right? Like they said, they have a classic inflation complaint. And then we say, wait a minute. Those statements are puffery. No one would take them into account. Lots of courts have said that. They said, no, no, it's repetition. And they emphasized it, 467, 475, 476. And we're back to the problem Judge Richardson pointed out earlier, which is we don't actually know, right? The plaintiffs didn't say, no, no, we're not. We agree it's all puffery by itself. They said, even if the occasional statement's puffery by itself, they're material altogether. The district court said zip about what she thought their theory was. And so we don't have a theory of liability to compare to the damages model. What we really have is kind of a few options of theories of liability that we're comparing to maybe a few options of damages models, it seems. So let me take two stabs at it, Judge Rushing, and come at it two different ways. The first is I really do think if you read the papers fairly, it's obvious how they got around the motion to dismiss. And now they've pivoted and they've recast their entire theory as about inflation maintenance. And the court can look at the complaint and the motion to dismiss. They are not price maintenance documents. This is not a price maintenance case. It's not pleaded like a price maintenance case. And the second thing I'd say, Judge Rushing, is I take the point that because of the district court's error at the motion to dismiss stage, you don't have an opinion from the district court that says, here's the theory that I think they advanced. The reason I don't think that matters, and it didn't matter in Comcast, was it's just a question between the match between the methodology and the plaintiff's liability theory. So if you read the papers and I'm right about their liability theory at the motion to dismiss stage, then you have a mismatch problem under Comcast. You don't need a document from the district court that tells you that. But their liability theory, I mean, it's about materiality, right? These became material at some point. Not necessarily that they became more and more and more and more convinced that the inflation increased over time. That's kind of an extrapolation from what they were saying, it seems to me. They were making a materiality point, which could have all happened before the date that the district court set as the beginning of this class, right? She shortened their class, potentially because it wasn't material until X date. We don't know if that was the reason, but maybe. But I think logically, Judge Rushing, for the statements to continue to become more material to investors, that means we're baking in the inflation over time. Otherwise, you're assuming that with that first DPA statement on January 7th, the start of the class period, that immediately bakes in, like, $50 into the stock price, and then for the next three years, every just safety statement maintains it. And the reason they never pleaded that is because, like, what judge would ever sign off on that? Nobody thinks that one innocuous statement baked everything in, and it's kind of at odds with the whole materiality through repetition. Their whole point was, you made these statements over time, and that's how they affect on the market, like a gradual inflationary effect. And I take the point that they could have tried to pivot after the district court narrowed the class period and said, well, it somehow got, like, baked in during those 15 months, and then starting at the DPA statement, it just plateaus and stays constant for three years. But that wouldn't match up with real-world facts either, so they never made that pivot. And I guess my frustration is, they've engaged in this sort of shell game to keep any court away by getting around the merits with adopting this theory. Then they run into the Comcast problem. They change their liability theory here, and it's sort of like, what's a court to do? And I think what a court should do is look at their pleadings and hold them to their liability theory. These plaintiffs are represented by two of the most sophisticated securities firms in the world, in Labaton and Robbins-Geller. This was not a Scribner's error or a mistake. This was a deliberate effort, a tactical decision to be vague, because if you bake in the inflation on the front end or you separate out the materialization of the risk on the back end, the damages in this case drop substantially. It's an entirely different case. So they said, we don't want to be specific. We don't want to bake in inflation. We don't want to tell you what the expert's going to do. We don't want to separate it out on the back end. We want maximum settlement value. I think they should be held to that tactical decision. I think the court should decertify the class, send it back. There's no do-over at Comcast or Ward or any of these cases. And the individual plaintiffs, they made a choice. They get to proceed with their individual claims if they want, and that's how the case should go. So one more, and I'm sorry to go over, but in looking at these theories, and you've talked about a couple of them and have questioned their real-world viability, Comcast talks about one of the things that is appropriate to do in this damages analysis is consider whether the damages methodology is a reasonable inference or is speculative. I guess that didn't come up at this certification hearing, correct? No, that's what we should have had an argument about, Judge Quattlebar. Because it wasn't defined in any way. If Mr. Kaufman had walked in and done something like he tried to do in BP and said, look, okay, the inflation got baked in over time, starting with the DPA statement, here's what that looks like. Here's how I'm going to take into account the quality reports. I recognize the inflation could vary. It's not 8% all the way through. Here's how I'm going to deal with that. And then here's how I'm going to separate out at the back end. If he had done that, then we should have been having the right argument, which is, is this sufficiently reliable under Comcast? Have you supplied the necessary evidentiary proof? Can a district court be confident that at the end of the day this thing is going to work? And if I find liability, we can actually do damages for the whole class, and I'm not here for a decade doing individualized damages calculations. And we would have loved to have that argument, but we never got off the ground because they never even got out of the box under Comcast. Does Dahlberg apply if you were doing that? Yes, yes. I mean, we could still bring a Dahlberg challenge to the expert, and we'd have that argument. But the problem with Dahlberging an expert in a situation like this is all he said was, I'm going to do out-of-pocket damages. It's like saying I'm going to do benefit of the bargain in a contract case, and here's a whole bunch of ways you could do it. And if you read Judge Quattlebaum, pages 591 and 592 of the JA, which are the key paragraphs of his opening report, every word that appears in those paragraphs could be cut and pasted into any expert report in any securities case. And the way I know that is he does that about a dozen times a year. Thank you, Mr. Wall. Mr. Gupta, we're happy to hear from you. Good morning, and may it please the Court, Deepak Gupta for the Plaintiffs' Appellees. The district court here certified a class action after evaluating a full expert record, and I think you heard Mr. Wall refer to the opening expert report, and their brief refers to it. What they consistently ignore is the 76-page rebuttal report that addressed every one of Boeing's criticisms, and that was before Judge Brinkema at the time that she issued her class certification decision. And I think many of the questions from the bench this morning... So tell me, in that report, tell me where do I find the methodology that's required by Comcast. I mean, I will tell you, I've read those, the depositions and the papers. I have yet to see any suggestion from your expert, pre-certification. We can talk about the reports you file as soon as you get certification, but pre-certification. Any suggestion of an actual methodology to determine damages on a class-wide basis, as opposed to a legal measure of damages that a court would dictate. I think the 76-page rebuttal report goes into great detail about what that methodology is. I want to look at what you think actually identifies an actual methodology, not a legal measure of damages. This is what compensatory damages means. That's what judges do. That's a legal question. I want to know what you think the best place I can find in the record where you believe he identifies an actual methodology for determining class-wide damages. Yeah, I think it is the rebuttal report, and I think it rests on... 76 pages. Can you give me a page that I'm looking at? Is there a description somewhere? Yeah, I think if we're discussing the... There was a lot of discussion this morning about the correspondence with the liability theory, and I think if you look at JA1447 to JA1445, the heading of that section is that Stultz's criticism... Wait, 1447 to 1445? 1455, sorry. The heading of that section is that Stultz's criticisms are premised on an apparent misunderstanding of the plaintiff's price-maintenance theory. And I think by this point, by the point that this class certification decision was before Judge Brinkman, it was apparent that that was the only theory the plaintiffs were advancing, was the price-maintenance theory. I mean, I pushed on Boeing's counsel about whether the plaintiffs had adopted the materiality by repetition, but, you know, the very reason I say that, you know, I think applies as well, that it is impossible for me to understand what the plaintiff's actual liability theory is, perhaps until you get to the briefs in this case, where then it does look like maintenance. I mean, it looks to me like at the district court, motion to dismiss and certification, there's no identification of the theory beyond that the inflations, you know, the statements inflated the price and caused damages. I think it's really difficult to say that when you're looking at the class certification. I mean, this issue was teed up directly. This was a focus of the expert report, the battle between the experts, and that section, it's one of the first sections of the rebuttal report, is all about how the only theory here is the price-maintenance theory. That's the same theory that was recognized by the Supreme Court in the Goldman case, and it's the only theory the plaintiffs were asserting. Where is it in your complaint? It's J.A. page 370, page 374. It's throughout the complaint. I'm not pulling them up right now, but aren't those just like the conclusory statements? There's not a basis. That's not a description, right? That's just where, if my recollection holds it, you say it's a price-inflation or price-maintenance case. That's a conclusion. We don't accept those, right? That's not a useful way for us to evaluate. Instead, what we look at is like the actual complaint, where it says, no, no, no, no, the company here, Boeing, has reformed its ways. It has changed what it's doing. All of those references seem directly contrary to a maintenance theory. No, I mean, I think we were clear in the complaint at those pages that that was the theory. We were clear even in the district court briefing, if you look at pages 2, page 9. But I think the relevant question to ask in asking whether Judge Brinkema abused her discretion in certifying the class is to look at the record that was before her. And this issue was teed up very directly, and the plaintiff said, this is our only theory of liability, is this price-maintenance theory of liability. I think you're identifying or identification of those pages in the rebuttal report and then in the complaint. Essentially, we're in response to Judge Richardson asking for the damages methodology. Oh, right, yes. And you're talking about now liability theory. So could you go back and identify the JA numbers where in the rebuttal report you identified your damages methodology? Right. So I think it's, you know, pages 7 through... Well, it's really the whole report. It may be helpful if I just describe what I think the expert said. I was hoping to get a JA number so I could look. I've been through the whole report too. I mean, I'll accept that if that's your best answer, but I was really hoping you'd say it would be something that we could actually look at and clearly see and not have to divine from 75 pages of report. I think starting at page 7 is where... Page 7 of the JA or of his report? Of his report, yeah. And I'll get you the JA page. 1436. Right, 1436. What he's explaining there is that, as you said... What paragraph am I looking at? When he says, out-of-pocket damages model, is that the description you think that gives us a methodology? It starts there, and if I can just paraphrase... Let me ask that question first. Do you believe saying out-of-pocket damages model, that that suffices in a securities case to resolve conflicts? Do you agree that that's not sufficient? I think just reciting the label would not be enough. It rests on a formula. That formula is inflation at purchase minus inflation at sale. It's applied identically, as Judge Rossing mentioned, to every class member. And the reason it's not just a label is it's a complete methodology. It measures artificial inflation in a stock price by reference to how the stock reacts to corrective disclosures and then disaggregates to the portion of the price movement that's attributable to fraud... Where are you reading from? I'm paraphrasing his explanation in the report. Or you might say just, like, rewriting his report, right? No, absolutely not. I don't think that suffices, because that's a legal description of what out-of-pocket damages are. It doesn't show in any way how you would technically apply it in this case. He explains that there are well-accepted tools, including event studies, and he actually performed an event study. So a promise of a future endeavour is sufficient. He actually performed an event study in this report at the class certification stage. He then used that same event study later to fill out the damages calculations. So it uses event studies, regression analysis and comparative incident analysis, all of which is in... He has the comparative incident analysis in the report. That's how he's able to discuss the Alaska Airlines incident. And this is the well-established method in securities cases. I mean, it is true, I think Mr Wall is right, that, you know, in many securities cases, this is not a difficult endeavour. That's what the Second Circuit and the Third Circuit have both said. But the reason it's not a difficult endeavour is because there are these established tools, and those tools respond to the facts that are adduced at discovery. I think my friend is faulting the expert for actually being responsible and saying, yes, this is a constant inflation case, here's how you compute constant inflation, but the model also... I thought he said constant inflation. He says that, you know, the Boeing expert accuses me of using constant inflation, and I'm not committing to doing that. I think that's what I mean by saying they're accusing him of a failing by being responsible, because what he says is... I don't know what I'm going to do yet, right, is what he says. I don't think so. I think he says this is a constant inflation model. Constant inflation would be consistent with the price maintenance theory. And then at page 15 of the report and following, what he says is, even if there were variable inflation found by the fact finder... And remember, this is at the certification stage. It's about a model under Comcast that's capable of class-wide resolution. It's not the full loss-causation analysis. If you were to require the full loss-causation analysis, you'd require perfect clairvoyance. The expert can't know what the fact finder is going to say. The expert can't know what the discovery is going to say. And often in a typical securities... Sorry. In a typical securities case, as a result of discovery, the statements get narrowed. Because remember, there's going to be discovery about materiality. There's going to be discovery about scienter. What did the company know? And what was the truth? How did the truth correspond to those statements? Plaintiffs can't know all of that information before they've gone through the discovery process. And it often narrows the statements. Now, as it happens here, this is an odd vehicle to be making these arguments because they're essentially accusing Kauffman of having made promises that he can't keep. But we know from the expert report at the merit stage that he was able to keep those promises. He was able to use a constant method. Back end report. If we found that the initial expert report and submission was insufficient and failed to comply with Comcast, you sort of suggest that his later report, the one that was filed right after class certification was done, is that like a harmless error argument? Help me understand how I ought to frame your discussion about even if we didn't do it right before we fixed it after the court had certified in light of all of our cases like Marriott and others? That's not what I'm saying. I'm saying don't just look at the opening report as they would have you do. Don't just focus on the merits report. Look at the rebuttal report. That was the report where the expert . . . What I'm asking is, you talk a lot about the merits report and suggest that we should look and you just brought up the merits report. What I'm asking is if we found that the pre-class certification reports failed to comply with Comcast. This is a hypothetical, so just accept the hypothetical. Are you making an argument that in light of the merits report we should find that Comcast failure to be harmless or do you think that the merits report doesn't bear on that question? I think we haven't made the argument that you're describing but I would say it would be essentially a Pyrrhic victory for Boeing that would go back down and that report is available. I think though the main response that I have is just to resist the premise of the hypothetical. You're not making a harmless error argument. You're saying that maybe the merits report helps us understand the pre-certification reports. I don't want to talk you out of a harmless error conclusion and I think in a common sense way regardless of whether it's technically a harmless error you can't unsee the fact that they're accusing us of promising something that we were actually able to deliver but what I would urge the court to do Can I just ask why you didn't deliver it before? You file it within a week of the class certification decision. It sort of feels a little bit like you're sandbagging it. You're sort of saying on the front end we don't know what we're going to do. Your expert says I'm not committing to this approach and then within days of the class certification decision you're like oh here it is. This thing that I couldn't do without discovery that I was incapable of running before I got all of the information and then literally as soon as the certification comes out within six days you file what you claim is like a complete expert report. I can understand why it would look that way. I think it is important to recognize that the judge did clarify the parameters of the class, the dates and often this is a continuous process. The discovery is ongoing. The expert reports are continually refined. That doesn't help me understand why if you had it sitting ready to go you didn't actually provide the information about how your expert was going to technically figure out this legal measure of damages in advance. I just resist the suggestion that there's some methodology that's missing from the rebuttal report and I would like to engage with you on that because I think that's the premise of their argument but it's not really specified. The rebuttal report actually does more than reports that are in typically certified class actions. It actually does the event study. Other than telling me to just read everything which was the first response, is there anything in particular you would like for me to read to focus my effort on what you think actually identifies the methodology as distinct from the legal measure of damages? You can just say read the 76 pages again. That's fine if that's what your answer is that you can only get it by osmosis of all of it, but if there's anything specifically you want me to look at, I'd love to know the page or paragraph that you want us to focus on. I'm going to key this off of the arguments that I think they're making, that they're critiquing the expert report. So I think with respect to the correspondence to our theory, which is what Comcast focuses on is does the damages model correspond to the plaintiffs? I think maybe I'm misunderstanding. What I'm asking is I want to know where your model is. Forget the correspondence to some theory. I want to know what is the methodology that your expert has put forward that's distinct from what the legal measure of damages is. What's the methodology? Forget the comparison. I'll get to the comparison in a minute. What I want to know is can you point me where I'm going to find a methodology for calculating these damages? Yeah, I mean, it is what I was describing earlier and it is the standard methodology. Can you tell me which page I'm reading? So if you look at pages JA1444 to 1447, that is the discussion of the calculation of inflation, the constant inflation and the way that the model can handle variations in inflation. If you look at page 1453, 1464 and 1464 to 65. So 1444 is what you're relying on is presumably where he says nowhere in my report do I claim that I intend to strictly use a constant dollar or constant percentage approach to back gas. That's like not a methodology that's telling us the methodologies he's not committing to using. No, well I think that's an explanation. I mean, if you look at the pages following it, he explains and he has a mathematical example where he credits Dr. Stultz's assumption that there may be some variability and then he explains how the out-of-pocket model in a standard securities case adjusts for that variability. And so what he's saying is I don't think there will be variability and he was right about that. But even if there were variability... Where does he say that? Where does he say I don't think there will be variability? He says at page 14... Sorry, page 15. Page 15 of the report or the JA? JA 1444. So that's page 15 of the report. He is describing this, what's called back-casting. I do want to emphasize here... Can you stay on the answer first? Can you give me where he says that I do not think there will be variation? You said he claimed that there was no variation but if there is, I can manage it. What I want to understand is you said he said... He says that in the opening report and this is a response to the critique. I don't have that page number on me, but this is a response to the critique. I understand, but you just represented that he said something, you're describing it, and I've not seen him say that yet. So I'm trying to understand if your representation actually reflects the record or you're just rewriting the record. I don't have the page number, but let me just characterize what he's saying. He's saying there are two methods for calculating constant inflation. There's percentage and there's dollar. And then Dr. Stultz criticizes that. And then in the rebuttal report, he's responding to that. He says, and I think this is what I mean by their faulting him for being responsible. It wouldn't be responsible to commit to that one calculation method because the fact finder can find variability. He didn't even commit to any of it. He's got a menu. It seems to me he presents a menu. I've got a menu and there's several things on it. I'm going to decide later which one. He's even got a catch-all or something that I've not discovered. And the problem with that is it's impossible to pin down and do the analysis that Comcast requires. Let's talk about the analysis that Comcast requires because I think the premise of a lot of these questions is at odds with Comcast. What Comcast is asking is the predominance question. And I think Justice Scalia was not known for someone who was freelancing away from the text. The text of Rule 23B3 is about the relationship between individual issues and common issues. And I think, Judge Rushing, you mentioned this earlier that much of what we're talking about here, these are issues that indisputably would be calculated class-wide. The only question is how they're going to be done in a later phase once you have all of the facts. But that's not what Comcast is about. Comcast was about a failure to assure the district court that it was capable of class-wide resolution. That's why Justice Scalia's opinion says it was inevitable there that the individual damages calculations would overwhelm the class. But let me just, I mean, I have a hard time I'm looking at Comcast now, and when you get to Section 3, it starts by saying, under our precedence, the proper model must be one that establishes damages are capable of measurement on a class-wide basis. Exactly. I'm not through. Then it goes on to say that there must be a comparison between that methodology and the plaintiff's theory. And then it goes on to say that even in the class stage, this is, I think, potentially even if it's not an individual issue, there's analysis about whether the inferences in the theory are reasonable or speculative. And that's the problem here, is that there's no way to do those things that Comcast requires if you don't at least say what you're going to do. Yeah, I think that if you look at the Second Circuit's decision in Wagoner, which is their interpretation of Comcast in the securities class action context, very many of the same arguments were made there. That was also a price maintenance theory. There was also a question about variable inflation. The court said the model can deal with it. And I think the misunderstanding of Comcast that I'm worried has permeated our discussion is that we're losing sight of the fact that Comcast was very much focused on whether or not there would be individualized damages calculations. Boeing hasn't actually identified any individualized issues. What they've instead done is fly-spec the nature of the calculation that will occur later at the loss causation phase once the discovery is in. And just take a look at, if you're looking at Comcast and trying to ask yourself, what is Comcast about? Take a look at pages 37 through 38 of Justice Scalia's opinion, because there he's talking about the problems that would ensue in that case because you had a damages model that, unlike here, was assuming the truth of four different theories of liability, three of which had been knocked out. And once they were knocked out, it wasn't possible to determine on a class-wide basis what the damages would be. And he says, you know, the problem here is that this will require liberant individual calculations. You have all these permutations, 2 million people, 16 counties. The permutations are endless. We can't know whether people in one county are suffering paying super competitive prices or people in another. And so you don't have a class. And that's why he's able to say at the end, Rule 23b-3 cannot authorize treating subscribers within the Philadelphia cluster as members of a single class. Here it's obvious that we have a single class. And what we're debating is whether Judge Brinkema abused her discretion, whether any reasonable judge could have concluded that in the battle of these experts, that our expert presented a damages model that was tethered to our theory of liability, the only theory of liability we were putting forward, and that was capable of class-wide resolution. That's the question before the court. And I think if you look at the rebuttal report and you have that understanding of Comcast, I do not think this court should conclude that she abused her discretion in crediting our expert over theirs. And I think if you did that, you would be creating a circuit split with the Second Circuit among other circuits. This is the established methodology across the circuits in securities class actions. The Fourth Circuit would be charting a new path and it would be one that I don't think is authorized by the text of Rule 23. Can I just ask one final question so that I can try to find it since you don't have it? If I'm looking for your expert's statement that he concluded that there would be no variance, where would you have me look? Or would you like to file a Rule 28J letter that tells me where to look? I can do that, Judge Rich, but let me just clarify that I'm not saying he said there would be no variance. I thought that's what you said. I think maybe the best way to understand this is that, and he was right about this as it turned out, that the hypothesis he was putting forward before discovery was that given this liability theory and given the event study, given what he knew about the efficient market for this stock, that there would not be variable inflation. He turned out to be right about that. Tell me where I find that. I understand you have that theory. What I'm trying to find is where your expert said that. He said that in the opening report and that's what Dr. Stutz was criticizing. Where is what I'm trying to get at? I will get you that page number. Mr. Wall, we're happy to hear from you. Just two points, Your Honors. The first is I'm happy to go off the rebuttal report. The definition of his model such as it is appears at page 1432. It is the out-of-pocket method for calculating damages which is artificial inflation at the time of purchase minus artificial inflation at the time of sale. That is a black's law dictionary of out-of-pocket damages. That is a legal standard for damages. It isn't a methodology. I was going to point to the statement, but Judge Rushing already read it at page 1444 where he disavows using a constant dollar or constant percentage approach. He specifically declines to say what his methodology will be. That is the most straightforward way to resolve the case. You need a methodology. Marriott from this court says you got to have it before certification. We know that because you can't run Comcast otherwise. Out-of-pocket damages is not enough. CLAS should be decertified. That's all fairly straightforward. The problem, this is my second point, is the question you asked, Judge Richardson. You said, well, wait a minute. Why don't you just say harmless error? You've got constant percentage now out there in your merits report even though you didn't do it before certification. He says, well, I don't want to make that argument to this court because he doesn't want this court to say anything about Comcast. Then he says it's going to be a Pyrrhic victory, his words, because the report is still out there. I think what the plaintiffs are intending to do is go back down to the district court and say to the district court, well, fine, they dinged me because I didn't do it before certification, but now you, Judge Brinkema, should look at my merits report because we have constant percentage inflation. Then we're straight into all the Comcast problems, which he's avoided having this court say anything about. Then you're right back here and we'll have that discussion again. If Judge Brinkema doesn't handle that problem appropriately, you apparently understand how to appeal these issues under Rule 23F. We'll do it then. As opposed to us trying to do that with what seems to be a fair bit of shifting sands on the theory and methodology and everything else from your colleague. I'd say a couple things, Judge Richardson, to try to persuade you otherwise, which is I think that rewards them for the obfuscation that has gone on all the way up through and including the briefing in this court. I think it's important to make clear they made a tactical decision not to put in a methodology. They're represented by sophisticated counsel. They don't get to go back down and have a do-over. We wouldn't be getting a do-over if we were here and we hadn't made the right arguments at the Rule 23 stage for Comcast purposes. We don't get to go down and rebrief it. They shouldn't get to go down and take another bite at the apple. The class should be decertified and we're done. Or second, I do think if that's their intent, which they weren't very clear about, I think it would be helpful to provide some guidance to the district court and say okay, look, if you think that they can get into that merits report, I would say they can't. It seems to me this court should address that one way or the other. If the district court's going to do it, you've got to look at whether that matches up with their liability theory because there are real serious issues here about whether there's a mismatch for Comcast purposes. I don't think they should get to duck all of that and go down and get a redo just because they've played this shell game between the district court and this court. Wouldn't the district court also be obligated to look at the reasonableness of the inference, the whole speculative nature? That would be part of the type of analysis, whether we do what you want or not. I guess instructions for future cases would be all those things are what are appropriate and required if it issue under Comcast. That's right. If they don't get to reopen expert discovery and if they're stuck with the merits report, which they should be, they don't get to redo discovery at this point, we've got all the same legal arguments that we made to this court. It's a legal problem under Comcast. It's got nothing to do with abuse of discretion. It's a legal error. I do think it's important to say to district courts because they have been treating this out-of-pocket damages as enough. Comcast is a real thing. The Supreme Court said rigorous analysis and evidentiary proof. Predominance is not just like a box checking exercise and we pass through. It is we want to make sure that district courts have a real way to calculate damages. Otherwise, the class action is not a superior device. What do you say about Tyson Foods? Just two years later, the majority doesn't mention Comcast. The sentence says we just decided to Comcast. The real issue is maybe pretty narrow that it's about representative sort of evidence. It's hard. The point is Comcast is a real thing and we can read just that case but post-Comcast, it doesn't seem like it's been talked about like it's all that real. I don't think that's fair, Judge Quattlebaum, because at least as I remember Tyson Foods, the petitioners came up and they were saying, oh, there's the question of uninjured class members and there's a question of representative evidence. They didn't bring it up on a Comcast theory. The dissent separately said, yes, there's a Comcast problem here but that was not the question presented that the court had granted. I don't think you can look at Tyson Foods and say, you know what, the Supreme Court is not taking Comcast seriously anymore. I think what you see is a disconnect between the courts of appeals and the district courts, if I'm being totally honest. The district courts, like the D.C. Circuit in rail freight, Ward in the Ninth Circuit, Nissan and Spearley in the Sixth Circuit, the courts of appeals seem to be taking Comcast seriously. They say real things. Your colleague says we created a circuit split, not requiring that. What's your response to that? Waggoner is his best case, but in Waggoner, they strip out the puffery statements. It's a pretty clean match. The expert there doesn't just say the expert there, Nye, says I'm doing constant dollar and I've got my event study and here are my evaluation techniques. Now I think we can have, remember we talked earlier what the case should have been about? I think if they'd done something like that, we could have a real interesting debate about whether that's actually enough to survive Comcast. I'm not sure that what the expert did in the Second Circuit should be enough, but that was not the focus of the decision or the briefing in the Second Circuit. It was a sideshow. I would say if that's the best case they've got, and I agree Waggoner is the best they've got, at least there the expert put on the table a methodology and said constant dollar and gave some indication of how he was going to do it. Now do I think the expert reports there is very good or should be enough for Comcast? I tell you probably not. But again, that wasn't the focus of the Second Circuit's decision. All it shows you is that's the best they have and this case outflanks that case. Because even though the courts of appeals have been good, the district courts have not. And what we have seen after Comcast, people were doing real reports, 50-60 page reports, methodologies, the whole deal. And then eventually we started backsliding and these district courts started saying out-of-pocket damages were enough. And now we've gotten to a point where plaintiffs are routinely filing and district courts are signing off on reports that look like this one where if I were a district judge and you asked me how I was going to calculate damages, I have the slightest idea how I would do it in this case. And I think the court ought to say something to clear that up. And I do think it ought to say something about not getting a do-over or if you're going to take a stab at that, here's some guidance on the Comcast question. This is a real thing. Thank you, counsel. We'll come down and greet counsel and proceed to our next case.
judges: Julius N. Richardson, A. Marvin Quattlebaum Jr., Allison J. Rushing